# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

STUDENTS FOR FAIR ADMISSIONS,

     Plaintiff,

v.

THE UNITED STATES AIR FORCE ACADEMY,
THE UNITED STATES DEPARTMENT OF DEFENSE,
LLOYD AUSTIN, in his official capacity as Secretary of Defense,
FRANK KENDALL III, in his official capacity as Secretary of the Air Force,
LIEUTENANT GENERAL TONY D. BAUERNFEIND, in his official capacity as
Superintendent of the United States Air Force Academy, and
COLONEL CANDACE PIPES, in her official capacity as Director of Admissions for the United
States Air Force Academy,

     Defendants.

---

# COMPLAINT

---

Plaintiff, Students for Fair Admissions, brings this civil action for declaratory and injunctive relief against Defendants and alleges as follows:

## INTRODUCTION

1. The United States Air Force Academy is one of the American military's premier institutions and the most prestigious source of commissioned officers in the Air Force. It is also one of the last remaining universities to expressly consider race as a factor in admissions.

2. The Academy has no justification for using race-based admissions. Its policy would be unconstitutional at all other public institutions of higher education. *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181 (2023). The Academy is not exempt from the Constitution. *Saum v. Widnall*, 912 F. Supp. 1384, 1391 (D. Colo. 1996). And any calls for judicial deference to the military on questions of racial discrimination are "'gravely wrong,'" both legally and historically.

*Harvard*, 600 U.S. at 207 n.3 (discussing the overruling of *Korematsu v. United States*, 323 U.S. 214 (1944)). As this Court has recognized, "it is beyond such cavil that civilian courts may review military matters when substantial constitutional rights are in jeopardy." *Widnall*, 912 F. Supp. at 1391 (involving Fifth Amendment equal protection claim).

3.    Because the Academy discriminates based on race, its admission policy should be declared unlawful and enjoined.

## PARTIES

4.    Plaintiff, Students for Fair Admissions, is a voluntary membership organization formed for the purpose of defending human rights and civil liberties, including the right of individuals to equal protection under the law, through litigation and other lawful means. SFFA is a nonprofit membership group of tens of thousands of individuals across the country who believe that racial preferences in college admissions, including at the academies, are unfair, unnecessary, and unconstitutional. SFFA has at least one member who is ready and able to apply to the United States Air Force Academy.

5.    Defendant United States Air Force Academy is a military service academy created under federal law and operating under the command and supervision of the Department of the Air Force and Department of Defense. The Academy and its leadership are responsible for creating and executing its admissions policies for prospective cadets, including the policy at issue here.

6.    Defendant United States Department of Defense is an executive agency headquartered in Washington, D.C., and is responsible for all aspects of the military, including the policy at issue here.

7.    Defendant Lloyd Austin is the Secretary of Defense and is responsible for all aspects of the military, including the policy at issue here. Secretary Austin is sued in his official capacity.

8.      Defendant Frank Kendall III is the Secretary of the Air Force and oversees all Air Force operations and policies, including the policy at issue here. Secretary Kendall is sued in his official capacity.

9.      Defendant Lieutenant General Tony D. Bauernfeind is Superintendent of the United States Air Force Academy and responsible for the creation, implementation, and oversight of all Academy policies, including the policy at issue here. General Bauernfeind is sued in his official capacity.

10.      Defendant Colonel Candace Pipes is Director of Admissions at the United States Air Force Academy and responsible for the creation, implementation, and oversight of all Academy admissions policies, including the policy at issue here. Colonel Pipes is sued in her official capacity.

## JURISDICTION & VENUE

11.      This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §1331.

12.      Venue is proper because a substantial part of the events or omissions giving rise to the claims occurred here. *See* 28 U.S.C. §1391(b).

13.      The Academy and Defense Department cannot invoke sovereign immunity. Federal courts routinely apply the APA's waiver of sovereign immunity to constitutional claims. *See, e.g., Maehr v. United States Dep't of State,* 5 F.4th 1100, 1106-07 (10th Cir. 2021) (Section 702 of the APA's waiver of sovereign immunity "is not limited to suits under the Administrative Procedure Act" and is "therefore applicable to a claim that [an agency] act[s] unconstitutionally"). The military and its service academies meet the APA's definition of "agency." *See, e.g., Doe v. Hagenbeck*, 870 F.3d 36, 45 (2d Cir. 2017); *Smith v. Dep't of Def.*, No. 20-CV-00487-MDB, 2023 WL 2401061, at *4 (D. Colo. Mar. 7, 2023).

## BACKGROUND

### I.      The Academy's Admissions Process

14.      Appointment (*i.e.*, "admission") to the Air Force Academy is highly selective: only fifteen percent of applicants to the Class of 2026 received an offer to join the Long Blue Line.

15.    Federal law caps the Academy's enrollment at 4,400 cadets. To account for attrition, the Academy reaches that number by matriculating roughly 1,200-1,300 cadets in each incoming class.

A.    **Application Process**

16.    Applying to the Academy involves several steps. Applicants initiate the application process by submitting a pre-candidate questionnaire, which asks them to self-report their race, sex, basic biographical information, high school GPA, standardized test scores, and athletic and extracurricular activities. Applicants can submit the pre-candidate questionnaire as early as March 1 of their junior year of high school.

17.    An admissions officer screens the questionnaire to confirm that the candidate satisfies the statutory eligibility criteria—U.S. citizen, under 23 years old, and without dependents—and has the minimum academic credentials for admission. Ninety-eight percent of applicants to the Class of 2026 made it past this first step. U.S. Air Force Academy, *Demographic Profile of the Incoming USAFA Class of 2026*, perma.cc/S6FK-DUG2.

18.    Applicants who make it past this initial evaluation are officially designated as "candidates" for admission and receive access to the full application on the Academy's website.

19.    The application itself resembles a typical college application. It includes official school transcripts; official standardized test score reports; multiple short answer essay questions; and evaluations from the candidate's 11th or 12th grade math and English teachers and their high school guidance counselor or a similarly situated school official.

20.    When the Academy opens the full application to candidates, it also directs them to take a physical fitness test (the Candidate Fitness Assessment), undergo a medical evaluation by the Department of Defense Medical Examination Review Board ("DODMERB"), and conduct an interview with an admissions liaison officer in their area. If the candidate is a recruited athlete, the interview

is conducted by a coach. If the candidate is an enlisted servicemember, the interview is with a commanding officer.

21.     Candidates can complete the application, fitness test, medical evaluation, and interview in any order, as long as all are completed by January 31st of the year the candidate would enter the Academy.

22.     While a candidate's medical evaluation paperwork must be submitted by January 31st, he or she does not need to receive final medical clearance until later in the spring semester. And while a satisfactory medical evaluation from DODMERB is sufficient for medical approval, DODMERB clearance is not required for admission. Candidates who are not cleared by DODMERB can still receive final medical clearance from the Academy through a medical waiver. When candidates are "competitive for an appointment to the Air Force Academy" and their applications are otherwise complete, the Academy "may process a medical waiver for USAFA on [their] behalf." U.S. Air Force Academy, *Instructions to Candidates*, 13 (July 1, 2021), perma.cc/32NH-TBTD. The Academy—not DOD-MERB—is the final approval authority for waivers. *See id.* at 14 ("DODMERB **IS NOT** the waiver authority." (emphasis original)).

23.     The Academy evaluates candidates using a "holistic" admissions process, similar to those formerly used by Harvard and UNC.

24.     The Admissions Office assigns each candidate a numerical score, known as a "Selection Composite Score" or "SCS." The SCS is a weighted composite of a candidate's academic performance, leadership potential, and his physical fitness scores and other intangibles considered by the admissions office "selection panel" (e.g., personal essay, interview, and so forth.).

25.     Sixty percent of a candidate's SCS is based on his academic qualifications, which are calculated using their standardized test results and the candidate's "prior academic record" in high school and/or college.

26.    A candidate's test scores make up two-thirds of the academic-qualifications component of the SCS, or 40% of their SCS overall. A candidate's "prior academic record," or PAR, makes up the remaining third of the academic qualifications component, or 20% of their SCS overall.

27.    A candidate's PAR is a weighted and normalized recalculation of his grade point average on a 4.0 scale, converted from his raw GPA, class rank, transcript, strength of high school, and rigor of curriculum.

28.    Twenty percent of the SCS is based on a candidate's "leadership potential" score, which is derived from a weighted combination of the candidate's athletic activities, extracurricular activities, and resume.

29.    The final 20% percent of the SCS comes from a candidate's "Selection Panel" score, which is calculated using a combination of objective metrics (such as Candidate Fitness Scores) and subjective considerations (such as personal essays, letters of recommendation, and feedback from the Admissions Liaison Officers who interview the candidates).

30.    The Admissions Office uses a candidate's Selection Composite Score, as well as the individual scores for each of the three elements that comprise it, to as a starting point for determining whether she is considered "qualified" for admission. To be fully qualified for admission, candidates must also pass their medical examinations. Because the Academy's process is "holistic," however, SCS scores do not dictate whether a candidate is found "qualified" or ultimately admitted or rejected. Indeed, the Academy has no minimum standardized test scores, GPA, or class rank thresholds that candidates must clear to be eligible for an appointment.

### B.    Nomination Requirement

31.    Candidates must secure a nomination to the Academy. Broadly speaking, there are two types of nominations: nominations from members of Congress or other "statutory nominating authorities," and "service-connected nominations" reserved for children of certain service members and

for airmen who are currently serving on active duty or in the Air Force Reserve. Most nominations come from statutory nominating authorities.

32.     ***Statutory Nominating Authorities.*** Under federal law, members of Congress, the Vice President of the United States, and the Academy's Superintendent are entitled to nominate eligible U.S. citizens for appointment to the Academy.

33.     Representatives and senators have statutory authority to nominate their constituents for admission to the Academy ("congressional nominations").[1] Each senator and congressman can have no more than five nominees attending the Academy at any given time. *See* §7442(a)(3)-(4). Most legislators stagger their vacancies to ensure that they have at least one open seat in the incoming class at the Academy each year.

34.     Members can nominate up to fifteen of their constituents for consideration for each vacancy. §9442(a). Eighty-five percent of members choose not to rank their nominees in order of priority—they simply nominate up to ten candidates and let the Academy select the nominee it finds most qualified. This practice is known as the "competitive method." Under the competitive method, the Academy ranks each candidate in a member of Congress's slate of nominees in an "order of merit" determined by their SCS, and the nominee with the highest SCS receives the appointment.

35.     Some members of Congress choose to identify a "principal" candidate and then name up to nine "alternates." When a member identifies a principal candidate, the Academy must select that candidate if he or she is qualified. If the principal candidate is unqualified, then the Academy either (a) chooses the alternate nominee with the highest SCS, just as it would under the competitive method (the "principal-competitive alternate" method); or (b) offers the appointment to the highest-ranked

---

[1] "Congressional nominations," as used in this complaint, includes nominations from Congressional Delegates from American Samoa, the District of Columbia the Virgin Islands, Guam, and the Northern Marianas Islands, as well as nominations awarded by the Governor and Resident Commissioner of Puerto Rico. *See* 10 U.S.C. §9442(a).

alternate nominee who is qualified, should the member choose to rank his alternate nominees in order of priority (the "principal-numbered alternate method").

36.     If a candidate has a congressional nomination but does not receive one of the appointments for his slate of nominees, he or she can still be admitted as a "qualified alternate." Two hundred qualified alternates are chosen each year, in order of merit based on their SCS. *See* 10 U.S.C. §9442(b)(5).

37.     Congressional nominations, however awarded, account for approximately three-fourths of each incoming class.

38.     Unlike members of Congress, who can nominate only their constituents, the Vice President can nominate any U.S. citizen for admission to the Academy. *See* 10 U.S.C. §9442(a)(2). The Vice President cannot have more than five nominees enrolled at the Academy at any one time. *Id.* Accordingly, vice-presidential nominees normally fill only one or two seats in each incoming class. Vice presidential nominees are also chosen in order of merit, based on their SCS ranking.

39.     Finally, the Superintendent can "nominate" up to fifty candidates each year, at his sole discretion. Superintendent nominations are only "nominations" in the most technical sense: Because the Superintendent also has authority over admissions decisions, they function as direct appointments to the Academy. Like additional appointees, superintendent nominations are available if the Academy has filled each vacancy for statutory nominating authorities and appointed 200 Qualified Alternates. *See* 10 U.S.C. §9442(d).

40.     ***Service-Connected Nominations.*** Several categories of applicants are eligible for service-connected nominations: (1) the children of active-duty servicemembers who have served continuously for eight years, reserve servicemembers who have served for the equivalent of eight active-duty years, veterans who are 100% disabled or otherwise eligible for retirement benefits, or servicemembers

who were killed in action; (2) enlisted airmen serving in an active duty or reserve capacity; and (3) cadets who are enrolled in ROTC or JROTC detachments. *See* 10 U.S.C. §9442(b).

41.     The children of eligible servicemembers receive their nominations, known as "presidential nominations," automatically. One hundred seats are reserved for presidential nominees in each incoming class. *See* 10 U.S.C. §9442(b)(1). Separately, sixty-five seats are set aside in each class for the children of servicemembers who were killed in action. *See* 10 U.S.C. §9442(a)(1).

42.     Active-duty airmen and airmen in the Air Force Reserve can obtain nominations from the Secretary of the Air Force. There are eighty-five seats in each incoming class for Secretary of the Air Force nominees who are serving on active duty, and another eighty-five for Secretary of the Air Force nominees who are in the reserves. *See* 10 U.S.C. §9442(b)(2)-(3).

43.     When the Academy is unable to fill its quotas for the 100 presidential nominees, 85 active-duty airmen, and 85 reservists described above, it can fill those vacancies with qualified candidates from other parts of the applicant pool. *See* 10 U.S.C. §9442(e).

44.     ROTC and JROTC cadets can also obtain nominations from the commanding officers of their respective detachments. ROTC and JROTC nominees can fill up to twenty seats in each incoming class. *See* 10 U.S.C. §9442(b)(4).

45.     The Academy is not required to select candidates for each type of service-connected nomination in order of merit based on their SCS. It can consider race when making these appointments.

46.     Some applicants secure nominations from multiple sources. For example, the child of an eligible service member who is automatically entitled to a presidential nomination can also earn a nomination from her congressman. Applicants in those circumstances can compete for appointments in both categories. The Academy does not publicly report the number of applicants who apply under these circumstances each year.

###### C.    Additional Appointees

47.    When the Academy has filled each nomination vacancy and appointed 200 qualified alternates, and still has not filled its class, it offers appointments to the remaining nominees. *See* 10 U.S.C. §9443. These "additional appointees" can be chosen regardless of the comparative strength of their applications, as long as they meet the minimum requirements for being considered "qualified." Under section 9443, 75% of additional appointees each year must have congressional or vice-presidential nominations. *See id.*

## II.    The Academy's Use of Race

48.    The Academy admits that it considers applicants' race when choosing who to admit, and that it uses racial preferences "to shape the racial diversity of each incoming class." Micaela Burrow, *Exclusive: Air Force Academy Privately Fretted the End of Race-Based Admissions Would Hamstring 'Diversity' Goals*, Daily Caller News Found. (Dec. 27, 2023), perma.cc/W2Y6-GM65 (quoting email sent by then-Superintendent Lt. Gen. Richard Clark and obtained through FOIA request). The Academy also admits that one of the ways it achieves its racial-balancing goals is by making race a determinative factor "when two candidates are similar in qualifications." *Id.*

49.    The Academy's racial preferences are consistent with—and derivative of—the DoD and Department of the Air Force's broader fixation on the color of the young men and women who comprise the pool of future military officers.

50.    On August 9, 2022, Secretary Kendall issued a memorandum setting forth "Department of the Air Force officer applicant pool goals, broken down by race, ethnicity, and gender." Dep't of Air Force, *Officer Source of Commission Applicant Pool Goals*, (Aug. 9, 2022), bit.ly/4fPtvPS.

51.    The purpose of the directive was to "continue[] [the Air Force's] goals toward achieving a force more representative of our Nation, while leveraging diversity to enhance the Air and Space Force's ability to deter, and if necessary, deny our Nation's competitors."

52.     The memorandum directed Air Force officer commissioning sources, including the Academy, to "develop a diversity and inclusion outreach plan aimed at achieving these goals no later than 30 September 2022."

53.     The racial goals were 67.5% white, 13% Black, 10% Asian, 7% multiracial, 1.5% American Indian/Native American, and 1% Native Hawaiian and Pacific Islander. The goals also call for 15% of officer candidates to be of Hispanic/Latino ethnicity, which the Academy categorizes separately.

54.     At various part of its admissions process, the Academy can and does consider race a "plus factor" for candidates who are racial minorities.

55.     To have race be considered a plus factor by the Academy, qualified and competitive applicants who are racial and ethnic minorities need only identify themselves as such on their applications. They do not need to discuss race in an essay or say that race has influenced their experiences or views.

56.     The Academy does not verify whether applicants are the race or ethnicity they identify on their applications. *See, e.g.*, OMB, *Statistical Policy Directive No. 15: Standards for Maintaining, Collecting, and Presenting Federal Data on Race and Ethnicity*, (Mar. 28, 2024).

57.     When it considers or tracks race in admissions, the Academy uses the following categories: (1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American. These categories are the same categories that Harvard and UNC used in *Harvard.*

58.     As mentioned above, candidates can obtain an appointment through one of four paths: (1) by obtaining a Letter of Assurance ("LOA"), which serves as a de facto form of early admission in which candidates receive conditional offers of acceptance reflecting the Academy's "inten[t] to offer [them] an appointment" once they complete their applications and obtain; (2) by having a

high enough Selection Composite Score to obtain an appointment from their congressional slate or service-connected nominee slate or by placing in the top 200 among the rest of the pool; (3) by receiving a Superintendent Nomination; or (4) by receiving an appointment as an Additional Appointee.

59.     The Academy is required by federal law to select candidates based on merit when making appointments from congressional slates and choosing qualified alternates, but no such obligations exist for LOAs, service-connected slates, additional appointees, or superintendent nominations. When making appointment decisions for those categories, the Academy can and does consider candidates' race.

60.     ***Letters of Assurance.*** As a practical matter, an LOA is equivalent to an immediate and binding offer of admission if a candidate has no medical issues and scores the minimum on his or her physical-fitness test. The Academy stresses that a candidate who receives a LOA still must receive a nomination before he or she is fully accepted, but that is a mere formality because the Academy will help LOA recipients obtain congressional nominations or simply grant them Superintendent Nominations.

61.     The Academy reserves most, if not all, LOA offers for candidates it considers "exceptional" in some way. The Academy has never specified how someone's race makes them "exceptional."

62.     ***Superintendent Nominations.*** Up to 50 applicants per year can be nominated—*i.e.*, admitted—directly by the Academy's superintendent. There are no restrictions on the superintendent's discretion, so he can and does consider race for Black, Asian American, and Hispanic/Latino candidates.

63.     ***Additional Appointees.*** As described above, candidates who aren't admitted under any other path can still be admitted as additional appointees. Several hundred candidates get in this

way each year. Unlike congressional appointments and qualified alternates, the Academy does not admit additional appointees by order of merit.

64.    One of the key reasons why the Academy deviates from its merit list when making these appointments is so that it can treat race as a "plus factor" for Black, Asian American, and Hispanic/Latino candidates.

65.    Taken together, the Academy's comprehensive racial preferences make race determinative for hundreds of candidates each year. And because race is a "positive" factor for some candidates, it is necessarily a "negative" factor for others. *Harvard*, 600 U.S. at 218-19.

66.    The Academy has no written guidance to admissions officers about how to use race. Its written guidance nowhere tells admissions officers not to use race when, for example, assessing a candidate's qualifications or leadership potential.

67.    The Academy's race-based admissions policy does not have a sunset date—a predetermined date that, without further action, would end the Academy's use of race as a factor in admissions.

68.    The Academy does not have a day, month, or even year when it expects that it can end its use of race as a factor in admissions.

69.    The Academy has no firmer logical or durational limit on its use of race in admissions than the ones articulated by Harvard and UNC in *Harvard*.

70.    The Academy has never publicly stated what the racial composition of its admitted or enrolled classes would be if it no longer used race as a factor in admissions.

71.    The Academy has never published, in the last decade, a study of race-neutral alternatives, where it calculates the racial composition of its admitted or enrolled class under different scenarios where race is no longer a factor but other factors are changed.

## III.    The Academy's Flawed Justifications for Its Race-Based Admissions Practices

72.    Before the Supreme Court's decision in *Harvard*, the Academy invoked the "educational benefits of diversity," like Harvard and UNC did, as a justification for its race-based admissions. Specifically, the Academy submitted that the racial "diversity" achieved through race-based admissions "reduc[ed] a sense of isolation and alienation" among ethnic minorities in the cadet wing and "encourage[d] greater participation by minority students in the classroom." *Students for Fair Admissions v. President and Fellows of Harvard Coll.*, No. 21-707, Tr. 145:1-146:11, (Oct. 31, 2022). Now that the Supreme Court has refused to allow colleges to justify their actions by reference to those "educational benefits," the Academy cannot rely on that asserted interest to justify the constitutionality of its race-based admissions.

73.    The Academy claims that its use of race in admissions is a national-security issue. The Air Force asserts that, to achieve its national-security interests, the racial makeup of the officer corps must mirror that of the enlisted corps and the general population. So the Academy must use race in admissions to change the racial composition of the Air Force's officer corps.

74.    As to how balancing the racial makeup of the cadet wing, and, in turn, marginally increasing the racial balance of the officer corps, is critical to fulfilling the Air Force's mission, the Academy offers a scattershot of reasons devoid of evidentiary support and naked appeals to deference.

75.    The Academy claims that racial preferences further compelling national-security interests because a racially balanced force is necessary for (1) unit cohesion and battlefield lethality; (2) recruiting top-tier talent to serve in the Air Force; (3) retaining that talent; and (4) preserving the Air Force's public legitimacy both here and abroad.

76.    None of these purported interests are meaningfully furthered by the Academy's race-based admissions policies. The Academy's ongoing racial discrimination can have dream-shattering consequences for the individual applicants who are unfairly denied admission, but it barely moves the needle in terms of the overall demographics of the officer corps.

77.     The Academy produces roughly one-fifth of new Air Force officers each year. And the number of minority officers it produces because of racial preferences are a fraction of that number.

78.     Each of the Academy's justifications view airmen as members of racial groups, rather than solely as individuals, and are grounded in assumptions about how minority service members think and feel.

### A.     Unit Cohesion and Lethality

79.     The Academy argues that statistical parity between the racial demographics of officers and enlisted airmen is necessary to preserve unit cohesion and ward off racial strife within units. In support of that assertion, it highlights anecdotal incidents of racial tension among enlisted service-members during the Vietnam War, most of which occurred in a brief period from 1969 to 1972. That talking point, raised for the first time by a group of *amici* in *Grutter* and repeated in virtually every government defense of racial preferences since, cherry-picks a few unfortunate incidents and extrapolates them to the American military in general. At best, it is a textbook example of conflating correlation with causation.

80.     In fact, racial violence and unrest had been negligible within the U.S. armed forces stationed in Vietnam prior to 1967, and it has been virtually nonexistent post-Vietnam. During the Korean War—just a few years after President Truman ordered desegregation in the military—practical measures outweighed racial beliefs, and integration failed to produce the violence or poor morale the military brass expected. The military brass of that era were pro-segregation, and their predictions of violence and poor morale did not bear out.

81.     The brief period of racial unrest that the Academy retells was not produced by color-blind policies. It was a tragic byproduct of broader factors: a changing social environment, a controversial war, and new conscription strategies that allowed wealthier Americans to escape the draft through college deferments while sending disproportionate numbers of low-income draftees to

frontline combat units based on their educational backgrounds. In short, the incidents that the Academy cites to justify open-ended racial preferences were the product of a perfect storm for racial conflict that has not existed for the past half century.

82.     Moreover, the underlying assumption of the Academy's argument is that airmen view their peers and superiors foremost in terms of race, rather than in terms of their ability or character traits like loyalty, devotion, and selflessness. Put differently, it assumes that airmen apply the same racial stereotypes to one another that the Academy applies to them. There is no evidence to suggest that's the case.

83.     The Academy makes a related argument that statistical parity between the racial demographics of the officer corps and those of the enlisted corps is necessary to foster trust between the enlisted corps and its leaders. The Academy has never provided evidence to support that assertion, and indeed, all available evidence says otherwise. This argument relies on crude and infantilizing stereotypes about the men and women who volunteer to serve in our armed forces, and it defies common sense. It assumes that black airmen will be more likely to trust a black officer or a chain of command that includes black officers, that Hispanic airmen are more likely to trust Hispanic officers, and so forth—because of their skin color, not their trustworthiness. And it brushes aside reams of evidence that trust between airmen is formed through battlefield performance, and that servicemembers in war zones are more concerned with their leaders' competency than with their skin color.

84.     The Academy broadly claims that the diversity produced by racial preferences facilitates military success and makes Air Force units more effective at accomplishing their missions. It claims, without any relevant evidence, that units are more adaptive, more efficient, and better at critical thinking and complex problem-solving when they are "racially diverse" (or, more accurately for purposes of the Academy's admissions policy, "racially balanced"). Neither the Academy nor the Air Force has commissioned any studies purporting to show this to be the case in the military context.

Nor can the Academy bridge its evidentiary gap through appeals to social-science papers measuring outcomes in inapplicable settings or inapposite career fields like stock trading or computer programming.

85.     Empirical evidence suggests the opposite. For example, the U.S. military's most elite special forces units are among its least racially balanced. Some races, like Native Americans, are vastly overrepresented, while others are underrepresented to nearly the same degree. Yet no one seriously contends that the green berets, Navy SEALs, or Air Force pararescuemen are insufficiently lethal.

**B.     Recruitment**

86.     The Academy's assertion that racial balancing is imperative for recruiting talented servicemembers is even less persuasive. According to the Academy, most promising recruits will hesitate to serve in an Air Force that is not "representative" of the population it protects. It also claims that this alleged inability to compete for "top talent" will have negative downstream effects on military readiness.

87.     Once again, the Academy provides little to no evidence to back this claim. The Academy does not elaborate on what it means for the officer corps to be sufficiently "representative" or "diverse." Nor does it explain how courts can measure whether its racial preferences are causing it to recruit the top talent in the country.

88.     The Academy simply declares that the Air Force will lose "societal trust" if racial metrics between the officer and enlisted corps (and between the officer corps and society at large) are not equivalent. The Academy further argues that this speculative loss of societal trust could, in turn, harm recruiting efforts.

89.     But today, despite the Academy's racial preferences, the Air Force is grappling with several years of recruiting shortfalls that have been unprecedented in the modern, all-volunteer era. The crisis reduced the Air Force's total manpower this year by 8,000 troops, and the service only met

its scaled-down recruiting goals for fiscal year 2024 by lowering physical fitness standards and accepting male recruits with up to 26% body fat.

90.     Tellingly, not even the Academy's leadership seems to buy what its admissions process is selling on race. During a July 19, 2023, hearing before the House Armed Services Committee, Subcommittee on Military Personnel, then-Superintendent Clark conceded that he had never heard of any instance where someone was interested in joining the Air Force but was turned off by its purported lack in diversity. Nor could he or any of the other service academy superintendents think of anyone who had.

### C.     Retention

91.     The Academy's arguments regarding retention are merely inverted versions of its unpersuasive arguments about recruiting. The Academy claims that a dearth of racial diversity will lead to waves of attrition, but it never specifies why it believes that to be true. At most, this position is based on a smattering of organizational surveys about "diversity climates."

92.     The Government Accountability Office has declared these surveys unreliable due to defects in design and administration. *See* Gov't Accountability Off., *Military Service Academies: Actions Needed to Better Assess Organizational Climate*, GAO-22-105130, at 1 (July 2022).

93.     And no studies conducted by the Academy or the Department of Defense more broadly have asked cadets whether the Academy should continue to use race as a factor in admissions.

94.     If anything, the Academy's assertions about retention are backwards. In-depth surveys and statistical assessments of the military's personnel crisis—*i.e.,* the rigorous analyses that the Academy has never publicly offered—show that the military's emphasis on non-merit factors, including servicemembers' immutable characteristics, is a leading cause of junior officer attrition. According to 9 out of 10 respondents, more officers would stay if the military was more of a meritocracy. And 71%

of active-duty officers believe the military would retain more talent if opportunities were based solely on merit.

### D. Domestic and International Legitimacy

95. The Academy's last resort is to claim that the military will suffer a crisis of legitimacy among the American people and foreign allies if it is insufficiently balanced by race. It maintains that an officer corps that does not reflect the racial makeup of the general population and the enlisted ranks will undermine the military's legitimacy by fueling perceptions of racial minorities serving as "cannon fodder" for white military leaders.

96. Again, this conclusory statement assumes that the American people assess the "legitimacy" and trustworthiness of an institution based on its racial makeup. That notion is both un-American and devoid of any evidentiary support.

97. To the contrary, a significantly higher percentage of Americans expressed confidence in the U.S. military three decades ago than they do today. And half of Americans now think that military leaders' over-emphasis on social-justice issues and political correctness is undermining military effectiveness.

98. 70% of Americans agree that universities should be "not allowed" to "consider race in admissions." Anthony Salvanto, *CBS News Poll Finds Most Americans Say Colleges Shouldn't Factor Race Into Admissions*, CBSNews.Com, (June 21, 2023), perma.cc/PW5D-ZUAT.

99. Thus, to the extent that the Academy's mission is to solidify the public's trust, its race-based admissions policy shoots itself in the foot.

## IV. *SFFA v. Harvard*

100. The Supreme Court held in *Harvard* that racial preferences in college admissions violate the Equal Protection Clause of the Fourteenth Amendment.

101. Harvard and UNC both admitted to using race in admissions, but both institutions strenuously insisted that they did so in a "holistic" manner that treated race only as an optional "tip."

Both institutions defended their consideration of race as necessary to further a compelling interest in "the educational benefits of diversity."

102.    The Court held both policies unconstitutional for several reasons.

103.    The Court deemed the universities' reasons for using race impermissibly vague and unmeasurable. Harvard claimed that its consideration of race was crucial for "(1) training future leaders in the public and private sectors; (2) preparing graduates to 'adapt to an increasingly pluralistic society'; (3) 'better educating its students through diversity'; and (4) 'producing new knowledge stemming from diverse outlooks.'" *Harvard*, 600 U.S. at 214. UNC made similar arguments but added a fifth justification: "enhancing appreciation, respect, and empathy, cross-racial understanding, and breaking down stereotypes." *Id.*

104.    The Court held that those goals could not justify race-based admissions because they could not "be subject to meaningful review" and were thus "[in]sufficiently coherent for purposes of strict scrutiny." *Id.* Federal courts had no way of measuring the Universities' self-assessed progress toward achieving those goals. *Id.* Moreover, "[e]ven if [those] goals could somehow be measured," there was no way for courts "to know when they have been reached, and when the perilous remedy of racial preferences may cease." *Id.*

105.    The universities also "measure[d] the racial composition of their classes using the following categories," which come from the federal government: "(1) Asian; (2) Native Hawaiian or Pacific Islander; (3) Hispanic; (4) White; (5) African-American; and (6) Native American." *Id.* at 2167. But those categories are "imprecise," "arbitrary," "undefined," "opaque," and both over- and "under-inclusive." *Id.*

106.    "The Universities' main response to these criticisms [was], essentially, 'trust us.'" *Id.* at 2168. Accepting that proposition, however, would have meant forgoing any meaningful judicial

review. And although the Court recognized that some "degree of deference" applies to universities' educational decisions, "deference does not imply abandonment or abdication of judicial review." *Id.*

107.    Both universities strenuously protested that, while they used race as a "positive" for certain applicants, "an individual's race is never a negative factor in admissions." *Id.* The Court found that argument "hard to take seriously." *Id.* Because "[c]ollege admissions are zero-sum," a "benefit provided to some applicants but not to others necessarily advantages the former group at the expense of the latter." *Id.* Thus, by using race as a "positive" for some applicants, Harvard and UNC necessarily used it as a negative attribute for others.

108.    Both universities assumed that increasing the percentage of racial minorities on campus would necessarily increase other students' exposure to different ideas and perspectives. In blunter terms, their policies assumed that all racial minorities had certain views and life experiences solely because of the color of their skin. But "[o]ne of the principal reasons race is treated as a forbidden classification is that it demeans the dignity and worth of a person to be judged by ancestry instead of by his or her own merits and essential qualities." *Id.* at 220.

109.    Neither Harvard's nor UNC's use of race had a logical end point. *See id.* at 221-25. Neither institution could identify when they would stop using race or under what circumstances.

110.    For example, UNC defined its racial "diversity" goals in relation to the racial demographics of the general population. *See id.* at 223 ("The University frames the challenge it faces as 'the admission and enrollment of underrepresented minorities,' a metric that turns solely on whether a group's 'percentage enrollment within the undergraduate student body is lower than their percentage within the general population in North Carolina.'" (cleaned up)). As the Academy does, UNC claimed that it "ha[d] not yet fully achieved its diversity-related educational goals" because it still needed to "obtain closer to proportional representation." *Id.*

111.    The Court rejected that metric. It reiterated that "'outright racial balancing' is 'patently unconstitutional,'" because "at the heart of the Constitution's guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial, religious, sexual or national class." *Id.* (cleaned up). UNC's use of race to obtain "proportional representation" in incoming classes was further unconstitutional, the Court held, because it "'effectively assur[ed] that race will always be relevant and that the ultimate goal of eliminating' race as a criterion 'will never be achieved.'" *Id.* at 223-24 (cleaned up).

112.    In sum, the Court held that both universities failed strict scrutiny and that their use of race was therefore unconstitutional because their "programs lack sufficiently focused and measurable objectives warranting the use of race, unavoidably employ race in a negative manner, involve racial stereotyping, and lack meaningful end points." *Id.* at 230.

113.    In a footnote to the opinion, the Court declined to analyze the use of race by the military academies because "none of the courts below addressed the propriety of race-based admissions systems in that context." *Id.* at 213 n.4. But *Harvard*'s reasoning makes it perfectly clear that the Academy's use of race in the admissions process is unconstitutional. *Compare United States v. Windsor*, 570 U.S. 744, 778 (2013) (Roberts, C.J., dissenting) (noting that the majority opinion, which declared unconstitutional a federal definition of marriage, left open the constitutionality of "state marriage definitions"), *with Obergefell v. Hodges*, 576 U.S. 644, 662-63 (2015) (explaining that virtually every court of appeals concluded that the logic of *Windsor* also deemed the state definitions unconstitutional).

114.    The Academy has not changed its race-based admissions in light of *Harvard* and has instead doubled down on categorizing individuals by their race and ethnicity.

## V.    Plaintiff and This Litigation

115.    SFFA has at least one member who is ready and able to apply to the United States Air Force Academy, including Member A.

116.     Member A is white, a U.S. citizen, and currently enrolled in high school. Member A has a near-perfect GPA despite studying an advanced curriculum and maintaining an active extracurricular schedule.

117.     Member A is a high school athlete and in excellent physical condition. Member A receives annual physicals and has no medical condition that would prevent Member A from being medically qualified to attend a military academy.

118.     Member A wants to attend the Academy and is ready and able to apply to the Academy for the Class of 2030. Member A will take all necessary steps to apply, qualify, and obtain a nomination.

119.     Member A joined Students for Fair Admissions because Member A supports its mission and this lawsuit.

120.     If the Academy is allowed to continue making admissions decisions based on applicants' race, SFFA's members—including Member A and other similarly-situated applicants—will suffer harm because they will be denied the opportunity to compete for an Air Force appointment on equal grounds, solely because of their race.

## CLAIM FOR RELIEF
## COUNT
### Violation of the Fifth Amendment

121.     Plaintiff incorporates and restates all its prior allegations here.

122.     "It is undisputed that 'service academies are subject to the Fifth Amendment.'" *Lebrun v. England*, 212 F. Supp. 2d 5, 16 (D.D.C. 2002); *see also Crawford v. Cushman*, 531 F.2d 1114, 1120 (2d Cir. 1976) ("A succession of cases in this circuit and others ha[s] reiterated the proposition that the military is subject to the Bill of Rights and its constitutional implications."); *Frontiero v. Richardson*, 411 U.S. 677, 688 (1973) (similar).

123.     The Fifth Amendment contains an equal-protection principle that binds the federal government and is no less strict than the Equal Protection Clause that binds the States. *Adarand*

*Constructors, Inc. v. Pena*, 515 U.S. 200, 224 (1995). "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny." *Id.* That principle stems not only from the Fifth Amendment, but also from the Fourteenth Amendment's guarantee of equal citizenship, the Constitution's limits on the scope of federal power, and bedrock principles of equality laid out in the Declaration of Independence.

124.    Because the Academy's admissions policy relies on racial classifications, it must satisfy strict scrutiny. *Id.* In other words, it must employ measures that are "narrowly tailored" to "further compelling governmental interests." *Harvard*, 600 U.S. at 206-07. The Academy's overt racial preferences cannot clear this bar.

125.    The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances, where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *See id.* at 207. The Academy's admissions policy does not meet this standard, and the Academy makes no pretenses that it does.

126.    The Academy asserts compelling interests in facilitating unit cohesion, achieving the increased lethality that supposedly flows from racially representative units on the battlefield, preventing declines in recruiting and retention, and ensuring public "legitimacy" (circularly defined by the Academy). It does not argue that the educational benefits of diversity are a compelling interest that could justify its use of race.

127.    *None* of the Academy's purportedly compelling interests can "be subjected to meaningful judicial review." *Harvard*, 600 U.S. at 214. There is no way for "courts … to measure these goals," and even if they could be measured, courts have no basis for assessing "when they have been reached." *Id.*

128.    The Academy's appeal to the military benefits of diversity is no different from Harvard and UNC's appeal to the "educational benefits of diversity." In both instances, the purported benefits are vague and "elusive." *Id.* In fact, the only quantifiable aspects of the Academy's race-based admissions program are the racial and ethnic enrollment percentage goals set by the Academy each year.

129.    Moreover, "the question in this context is not one of *no* diversity or of *some*: it is a question of degree. How many fewer leaders [the Academy] would create without racial preferences, or how much poorer the education at [the Academy] would be, are inquiries no court could resolve." *Id.* at 215.

130.    The Academy's admissions program also fails narrow tailoring because it "fail[s] to articulate a meaningful connection between the means [it] employ[s] and the goals [it] pursue[s]." *Id.* The Academy claims that racial preferences are necessary to ensure "an officer corps that reflects the demographics of the nation it serves." To that end, it carefully tracks and "shape[s]" the class composition of "African Americans," "Hispanics," and "Asians." That interest is not compelling; it is pure racial balancing.

131.    Besides, these categories are "imprecise in many ways." *Id.* at 216. "Some of them are plainly overbroad: by grouping together all Asian students, for instance, [the Academy is] apparently uninterested in whether *South* Asian or *East* Asian students are adequately represented, so long as there is enough of one to compensate for a lack of the other." *Id.* (emphasis original). "Meanwhile, other racial categories, such as 'Hispanic,' are arbitrary or undefined." *Id.*

132.    Furthermore, the Academy produces only seventeen percent of newly commissioned Air Force officers each year. Even if the Air Force and, by extension, the Academy had a compelling interest in ensuring perfectly proportional racial representation between the cadet wing and the officer corps, the Academy's use of the "invidious" practice of racial preferences barely moves the needle in terms of the demographics of the Air Force-wide officer corps. *Id.* at 214.

133.    Nor has the government offered facts or evidence-based reasoning to support its excuses for using race at the academies. The government asserts that the "service academies have carefully considered potential race-neutral alternatives" and "have concluded that, at present, those alternatives would not achieve the military's compelling interest in fostering a diverse officer corps." But it has never identified any studies, reports, or experiments "carefully considering" race-neutral alternatives.

134.    Contra the Academy, military academies can achieve racially diverse student bodies through race-neutral means. The Coast Guard Academy provides a real-world example. Until 2010, that academy was prohibited by federal statute from using racial preferences in its admissions process. In the two years before the Academy began considering race, it launched an aggressive advertising and recruiting campaign targeting minorities. At the end of those two years, the academy had increased minority enrollment by 60%—from 15% to 24%. Those numbers were within a few percentage points of the other academies, which had been using explicit racial preferences for years.

135.    The Academy's race-based admissions violate the Fifth Amendment because "race may never be used as a 'negative'" or "operate as a stereotype." *Id.* at 219 (cleaned up). As discussed above, the Academy openly acknowledges that race is determinative for some applicants. Because the Academy provides a racial "benefit" to "some applicants but not to others," it "necessarily advantages the former group at the expense of the latter." *Id.* Because race is a "positive" for minority applicants who receive preferences, it is necessarily a "negative" for all others. *Id.*

136.    The Academy's admissions program also relies on impermissible stereotypes. The Supreme Court has "long held that universities may not operate their admissions programs on the 'belief that minority students always (or even consistently) express some characteristic minority viewpoint on any issue,'" and that they may not "assum[e] that 'members of the same racial group—regardless of their age, education, economic status, or the community in which they live—think alike.'" *Id.* at 219-

20 (cleaned up). The Academy does exactly that when it uses racial preferences to "foster trust between the enlisted corps and its leaders," create "sociocultural competencies essential to multicultural leadership in the 21st century," and "ensur[e] that the military contains the cultural and racial identities necessary to better understand our partner forces."

137.    The Academy is violating equal protection by engaging in the "patently unconstitutional" practice of "[o]utright racial balancing." *Id.* at 223. The Air Force sets specific racial goals for future officer candidates, including Academy cadets, and "shape[s] the racial diversity of each incoming class" accordingly. Burrow, *supra* at ¶52. It is not "'treat[ing] citizens as individuals,'" but as "'simpl[e] components of a racial … class.'" *Harvard*, 600 U.S. at 223 (cleaned up).

138.    The Academy's use of race in admissions is also unconstitutional because it "lack[s] a 'logical end point.'" *Id.* at 221 (cleaned up). Indeed, under its theory of "racial diversity," it would be impossible for the Academy to stop considering race. By tying its racial enrollment needs to the ever-shifting demographics of the country and the enlisted ranks, the Academy is promising to use race in perpetuity. *Cf. id.* at 221-25.

139.    The Academy's status as a military academy does not mean that courts must defer to its conclusory assertions that it needs to employ racial preferences, let alone diminish any of the constitutional violations described above. *See Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978) (courts are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context"). Although courts have been mindful of the military's unique role in society and the unique considerations that come with it, no level of deference justifies systematic racial discrimination. *See Harvard*, 600 U.S. at 217 ("any deference must exist 'within constitutionally prescribed limits'").

140.    In fact, as the Court recognized in *Harvard*, blind deference to assertions of national security or military necessity can lead to "gravely wrong" outcomes and gross violations of civil rights.

*Id.* at 207 n.3. "[I]n the infamous case *Korematsu*," the "Court upheld the internment of 'all persons of Japanese ancestry in prescribed West Coast ... areas' during World War II because 'the military urgency of the situation demanded' it." *Id.* (cleaned up). The Supreme Court has "since overruled *Korematsu*, recognizing that it was 'gravely wrong the day it was decided.'" *Id.* (cleaned up).

141.    "The Court's decision in *Korematsu* nevertheless 'demonstrates vividly that even the most rigid scrutiny can sometimes fail to detect an illegitimate racial classification' and that '[a]ny retreat from the most searching judicial inquiry can only increase the risk of another such error occurring in the future.'" *Id.* (cleaned up).

142.    Because the Academy's use of racial classifications in admissions violates the Fifth Amendment, it should be declared unlawful and enjoined.

**WHEREFORE**, Plaintiff asks this Court to enter judgment in its favor and to provide the following relief:

a.    A declaratory judgment that the Academy's use of race in admissions is unconstitutional;

b.    A permanent injunction prohibiting the Academy from considering or knowing applicants' race when making admissions decisions; and

c.    All other relief that Plaintiff is entitled to, including, but not limited to, attorneys' fees and costs.

Respectfully submitted,

_s/ Thomas R. McCarthy_

Thomas R. McCarthy
J. Michael Connolly
Cameron T. Norris
James F. Hasson
CONSOVOY MCCARTHY PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com

Dated: December 10, 2024                    *Counsel for Students for Fair Admissions*